**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Criminal Case No. 21-cr-034-WJM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.     MICHAEL SHAWN STEWART, and
2.     BRYANT EDWIN SEWALL,

      Defendants.

---

**ORDER GRANTING THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT
REGARDING THE YOUNG PARTIES' INTEREST IN ASSET NOS. 38–54
AND DENYING PETITIONERS' MOTION FOR RULE 11 SANCTIONS**

---

Before the Court is the United States of America's (the "Government") Motion for Summary Judgment Regarding the "Young Parties'" Interest in Asset Nos. 38–54. (ECF No. 585.) Petitioners Hause Haus, LLC; Casa Conejo, LLC; Michael Charles Baker; Salve Regina Trust; West Beach, LLC; Michael Young; Maria Young; Susanna Young; Joseph Young; Luisa Young; Michael Young II; and Monica Young (collectively, "Petitioners" or the "Young Parties") filed a response. (ECF No. 620.) The Government filed a reply. (ECF No. 633.)

Also before the Court is "Certain Petitioners" Michael Young and Maria Young's Motion for Rule 11 Sanctions. (ECF No. 624.) The Government filed a response. (ECF No. 634.) Petitioners filed a reply. (ECF No. 652.)

For the reasons set forth below, the Government's Motion is granted, and Petitioners' Motion is denied.

## I. THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT

### A.     Background[1]

In May 2024, a jury found Defendants Michael Shawn Stewart and Bryant Edwin Sewall guilty of 14 counts of wire fraud, all in violation of 18 U.S.C. § 1343, and one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 371.  (ECF No. 315.)  Stewart and Sewall's convictions arose from a scheme to defraud investors through the business dealings of certain companies partly owned by them—namely, Mediatrix Capital Inc. ("Mediatrix") and Blue Isle Markets Inc. ("Blue Isle").  (*See generally* ECF No. 1.)

In November 2024, the Court entered Preliminary Orders of Forfeiture ("POFs") identifying 54 assets subject to criminal forfeiture as proceeds traceable to Stewart and Sewall's offenses.  (ECF Nos. 439, 440.)  In this third-party ancillary proceeding, Stewart and Sewall's business partner, Petitioner Michael Young, along with certain of

---

[1] The following factual summary is based on the parties' briefs on the Motion and documents submitted in support thereof.  These facts are undisputed unless attributed to a party or source.  All citations to docketed materials are to the page number in the CM/ECF header, which sometimes differs from a document's internal pagination.

At the outset, the Court observes that many of Petitioners' responses to Movant's Statement of Material Facts ("MSMF") and the additional assertions set forth in Petitioners' "Statements of Additional Potentially Disputed Facts" ("SADF") are devoid of any citation to specific evidence in the record.  (*See, e.g.,* MSMF 20, 26, 31, 32, 35, 36, 39, 44–46, 48, 51, 56, 57; SADF 1, 4–7, 10–15, 17–18, 25–27.)  To the extent Petitioners are intending to rely on Michael Young's blanket "Verification" that he has "personal knowledge of the matters stated herein" and they "are true and correct to the best of [his] knowledge and belief," (ECF No. 620 at 40), this does not comport with the Court's Revised Practice Standards.

WJM Revised Practice Standard requires that "[a]ny denial shall be accompanied by a brief factual explanation of the reason(s) for the denial *and a specific reference to supporting evidence in the record.*"  WJM Revised Prac. Standard III.F.4(b) (emphasis added).  Likewise, SADF "shall be accompanied by *specific reference to evidence in the record* supporting the fact or demonstrating that it is disputed."  WJM Revised Prac. Standard III.F.5 (emphasis added).  Accordingly, the Court deems undisputed any MSMF to which Petitioners have asserted a denial but failed to cite specific evidence in the record in support of their denial, and similarly disregards any SADF that Petitioners have failed to support with specific evidence in the record.  *See* Fed. R. Civ. P. 56(c)(1)(A), 56(e).

his family members and entities affiliated with him, seek to exclude certain assets in which they claim to have a legal interest from the Court's final orders of forfeiture. Michael Young was not indicted alongside Stewart and Sewall.  However, in January 2021, he pled guilty to a violation of 18 U.S.C. § 1001 based on a false statement to the Securities and Exchange Commission ("SEC") in a separate criminal action.  (*Id.* at 3 ¶ 3; ECF No. 585-2 at 26–37.)

In their Second Amended Ancillary Petition (the "Petition"), Petitioners specifically ask the Court to exclude the following assets from any final orders of forfeiture:

38. Approximately $262,773.00, plus accrued interest, from Banco Popular Account 274-049843;

39. Approximately $5,663.00, plus accrued interest, from Bank Popular account 030-115590 West Beach;

40. Approximately $1,429,942.00, plus accrued interest, from UBS Financial Services Inc Account DK account #47422;

41. Real Property located at 5406 South Cottonwood Court, Greenwood Village, CO 80121;

42. Funds from the sale of 330 Dorado Beach East, Dorado, Puerto Rico, plus accrued interest;

43. 2019 Honda Odyssey Passenger Van with VIN 5FNRL6H86KB037764;

44. Approximately $25,935.00, plus accrued interest, from KeyBank Account 760143007226;

45. Approximately $311,096.00, plus accrued interest, in funds from UBS Financial Services Inc Account DK 47885 94;

46. Approximately $5,335.00, plus accrued interest, from KeyBank Account 760452066425;

47. 2016 Audi A8 Sedan VIN WAU43AFD0GN021899;

48. All funds held in CollegeAmerica 529 account DK

48076 94, plus accrued interest;

49.     All funds held in CollegeAmerica 529 account DK
48077 94, plus accrued interest;

50.     All funds held in CollegeAmerica 529 account DK
48078 94, plus accrued interest;

51.     All funds held in CollegeAmerica 529 account DK
48079 94, plus accrued interest;

52.     All funds held in CollegeAmerica 529 account DK
48080 94, plus accrued interest;

53.     Real Property located at 12088 Tetzel Ave, Port
Charlotte, Florida 33981; and

54.     Approximately $147,750.00 in Charitable returns.

(collectively, the "Claimed Assets") (ECF No. 439 at 5–6; ECF No. 440 at 5–6.)

The Court reserves its discussion of particular facts where pertinent to its

analysis below.  However, the facts generally pertaining to Stewart, Sewall, and Michael

Young's formation, operation, and receipt of funds from Mediatrix and Blue Isle are as

follows.

Mediatrix was incorporated in Belize in 2015.  (ECF No. 585 at 4 ¶ 4; ECF No.

585-2 at 39.)  At all relevant times, Michael Young held the title of CEO of Mediatrix.

(*Id.* at 4 ¶ 6.)  His role in Mediatrix was marketing; he did not handle or have access to

Mediatrix's accounting or banking.  (*Id.* at 4 ¶ 7.)

Mediatrix was a "Trading Advisor of Foreign Currency FX Spot and OTC FX

Options."  (*Id.* at 4 ¶ 5.)  The company raised funds from investors to trade in the

Foreign Exchange.  (*Id*.)  Mediatrix began taking investor money in 2015.  (*Id.* at 5 ¶

16.)  It lost approximately all $500,000 of investor funds raised that year.  (*Id.* at 5 ¶ 17.)

In late 2015, Mediatrix purchased Sewall's trading algorithm.  (*Id.* at 4 ¶ 8.)

4

Sewall, too, lost investor funds trading under his algorithm prior to Mediatrix.  (*Id.* at 5 ¶ 18.)  Michael Young, Stewart, and Sewall thereafter became co-owners of Mediatrix, through entities controlled by them.  (*Id.* at 4 ¶ 8.)  Blue Isle was also incorporated in late 2015, under the laws of Saint Vincent and the Grenadines.  (ECF No. 585-2 at 80.)  Michael Young, Stewart, and Sewall, through their respective entities, each also had a significant ownership interest in Blue Isle.  (*Id.* at 4 ¶ 10.)

After its formation, Blue Isle operated as a brokerage for Mediatrix's trades that employed another brokerage to execute those trades.  (*Id.* at 4 ¶ 9.)  Mediatrix was the only customer of Blue Isle and operated as the "sales and marketing operation of the joint companies."  (*Id.* at 4 ¶ 11–12 (quoting ECF No. 585-2 at 16:10–12).)  "Blue Isle made money through markups on trades" for Mediatrix, which were assessed regardless of the success of the trades.  (ECF No. 585 at 5 ¶ 13 (quoting ECF No. 585-2 at 50:21).)  These markups were issued to the partners (Michael Young, Stewart, and Sewall) as dividends based on their ownership interest in Blue Isle and Mediatrix.  (ECF No. 585 at 5 ¶ 14.)  The source of all funds, gains, or commissions obtained by Blue Isle and Mediatrix were from investor funds.  (*Id.* at 5 ¶ 15.)

In all, Michael Young solicited investors for Mediatrix from 2015 to July 2019.  (*Id.* at 9 ¶ 38.)  He received salary payments from Mediatrix totaling $424,626.75 in exchange for his employment, which was largely commiserate with his wages as reported in his taxes.  (*Id.* at 9 ¶ 40.)  He also received payments identified as "reimbursements," in the amount of $194,467.60.  (*Id.* at 9 ¶ 41.)  Separate from that amount, Blue Isle also reimbursed the Youngs for the purchase of the 2016 Audi A8 Sedan and the 2019 Honda Odyssey Passenger Van.  (*Id.* at 9–10 ¶¶ 42–43.)

Lastly, Michael Young received a substantial amount in dividends from markup revenue from Mediatrix accounts and Blue Isle, directly or through intermediary accounts.  (*Id.* at 10 ¶ 44.)  Per the Government's accounting, he received $8,000,934.34 in dividends over the course of his employment.  (*Id.*)  All of the dividend payments from Mediatrix and Blue Isle were handled by Stewart.  (*Id.* at 10 ¶ 46.)

The dividends received by Michael Young constitute and/or were used to purchase the Claimed Assets, with the exception of the 2016 Audi A8 Sedan, the 2019 Honda Odyssey, and $3,188.79 held in KeyBank account #6425.  (*Id.* at 10 ¶ 47.)[2]  The claims of Petitioners Hase Haus, LLC, Casa Conejo, LLC, Michael Charles Baker, Salve Regina Trust, West Beach LLC, Maria Young, Susanna Young, Joseph Young, Luisa Young, Michael Young II, and Monica Young over the Claimed Assets are likewise "based solely on the remittance of funds from Mediatrix and Blue Isle to Michael Young and his related entities, which were subsequently transferred to them."  (*Id.* at 11 ¶ 50.)  And, those Petitioners agree that "no other source of funds other than funds derived from Michael Young's Mediatrix and Blue Isle payments . . . were used to purchase or acquire the Claimed Assets."  (*Id.* at 12 ¶ 53.)  The Claimed Assets in the Petition were purchased after Stewart and Sewall's criminal scheme began in "at least late 2015 and continuing until at least September 2019."  (*Id.* at 11–12 ¶ 52 (quoting ECF No. 1 at 1).)

## B.    Applicable Law

Read together, 18 U.S.C. § 981, 28 U.S.C. § 2461(c), 21 U.S.C. § 853, and Federal Rule of Criminal Procedure 32.2 set out a two-step procedural framework for

---

[2] The Government has traced $3,188.79 held in KeyBank account #6425 to funds received from Petitioners' family and friends and has agreed to exclude that amount from any motion for final orders of forfeiture.  (ECF No. 585 at 11 n.9.)

criminal forfeiture.  *See* 28 U.S.C. § 2461(c) (incorporating the procedures set forth in 21 U.S.C. § 853); *United States v. Courtney,* 816 F.3d 681, 685 (10th Cir. 2016) (explaining that, though § 981(a)(1)(C) is a civil forfeiture statute, "[s]ection 2461(c) is read as a 'gap-filler' between civil and criminal forfeiture") (internal citation and quotation marks omitted).

At the first step, the Court must "determine what property is subject to forfeiture under the applicable statute" and enter a preliminary order of forfeiture "setting forth the amount of any money judgment, directing the forfeiture of specific property, and directing the forfeiture of any substitute property if the government has met the statutory criteria." Fed. R. Crim. P. 32.2(b)(1)(A).  Section 981(a)(1)(C) instructs that "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity' . . . or a conspiracy to commit such offense" "is subject to forfeiture to the United States."  18 U.S.C. § 981(a)(1)(C); *see also* 18 U.S.C. § 1956(c)(7) and 18 U.S.C. § 1961(1) (together defining "specified unlawful activity" as inclusive of "any act which is indictable under . . . . section 1343 (relation to wire fraud)").  Once the court finds that property is subject to forfeiture under federal law, "it must promptly enter a preliminary order of forfeiture," without regard to any third party's interest in the property."  Fed. R. Crim. P. 32.2(b)(2)(A).

Step two "addresses third-property interests in property deemed forfeitable." *United States v. Peck,* 139 F.4th 1158, 1168 (10th Cir. 2025). "Section 853(n) permits a third party to assert his interest in subject property filing a petition." *Id.*  Upon the filing of a third-party petition asserting an interest in property to be forfeited, the Court must conduct an ancillary proceeding.  Fed. R. Crim. P. 32.2(c)(1).  The ancillary proceeding

process ensures "[t]hird parties" have "an opportunity to assert their rights to the property," because they have "no right to challenge the preliminary order's finding of forfeitability" in the criminal case. *United States v. Andrews,* 530 F.3d 1232, 1236 (10th Cir. 2008).

"[Section] 853(n)(6) sets out the exclusive ways in which a third party may obtain relief from a criminal-forfeiture order." *United States v. Dong Dang Huynh,* 595 F. App'x 336, 339 (5th Cir. 2014). To prevail in the ancillary proceeding, a third-party petitioner must establish "by a preponderance of the evidence that—

> (A)    The petitioner has a legal right, title, or interest in the property, and such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section; or
>
> (B)    The petitioner is a bona fide purchaser for value of the right, title, or interest in the property and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture under this section.

21 U.S.C. § 853(n)(6)(A)–(B).

"[B]efore conducting a hearing on the petition, the court may permit the parties to conduct discovery in accordance with the Federal Rules of Civil Procedure if the court determines that discovery is necessary or desirable to resolve factual issues." Fed. R. Crim. P. 32.2(c)(B). "When discovery ends, a party may move for summary judgment under Federal Rule of Civil Procedure 56." *Id.*

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. 56(a). A fact is "material" if, under the relevant substantive

8

law, it is essential to proper disposition of the claim.  *Wright v. Abbott Labs., Inc.*, 259

F.3d 1226, 1231–32 (10th Cir. 2001).  An issue is "genuine" if the evidence is such that

it might lead a reasonable trier of fact to return a verdict for the nonmoving party.  *Allen*

*v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).  Courts view the evidence and all

reasonable inferences therefrom in the light most favorable to the nonmoving party.

*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

**C.    Petitioners Lack Standing as to Asset No. 54**

"When a third party asserts an interest in forfeitable property, the first question is

whether the party has standing."  *United States v. Rudolph,* 2024 WL 1604750, at *4 (D.

Colo. Apr. 12, 2024) (citing 21 U.S.C. § 853(n)(2); Fed. R. Crim. P. 32.2(c)); *see also*

*United States v. Swartz Family Tr.,* 67 F.4th 505, 515 (2d Cir. 2023).  Though there

appears no dispute that Petitioners have standing as to Asset Nos. 38–53, (*see* ECF

No. 633 at 16 n.9), the Government contends that Petitioners lack standing to challenge

forfeiture of Asset No. 54, consisting of approximately $147,500.00 in "charitable

returns," (ECF No. 585 at 29).  The Court agrees.

"To establish that they have statutory standing under § 853(n), Petitioners must

first demonstrate that they have a legal interest in the property to contest the forfeiture."

*Rudolph,* 2024 WL 1604750, at *4.  "Petitioners have the burden to prove a legal

interest in the property exists" under applicable state law.  *Id*.; *see also Andrews,* 530

F.3d at 1238 ("in federal forfeiture proceedings, ownership interests . . . are defined by

state law").

The Government explains that "Petitioners used investor funds to make

donations to several charities."  (*Id.* at 3 n.1.)  The "charitable returns" in turn "comprise

funds returned to the SEC Receiver from those charities." (*Id.*)  The Government argues that, since "Petitioner Young irrevocably gifted the charitable returns," "Petitioners no longer have a legal interest in those funds."  (ECF No. 585 at 29.)

Considering Petitioners "ownership interests . . . are defined by state law," the Court also looks to state law to determine whether they have *relinquished* any ownership interest in the charitable returns by gifting them.  *Andrews,* 530 F.3d at 1238. Under Colorado law, "a completed inter vivos gift requires '(1) [a] clear and unmistakable intention to make the gift; and (2) the consummation of such intention by those acts which the law requires to divest the donor and invest the donee with the right of the property.'"  *Bennett v. Reed,* 2024 WL 717930, at *1 (Colo. App. Mar. 6, 2025) (quoting *Hardy v. Carrington,* 288 P. 620, 623 (Colo. 1930)) (alterations in original).  In other words, an *inter vivos* gift is established when "the donor parts with all present and future dominion over the property given," and the gift is "absolute and irrevocable without reference to taking effect at some future period."  *Johnson v. Hilliard,* 160 P.2d 386, 389 (Colo. 1945).

Though, ordinarily, "[w]hether the requirements of a gift have been met are questions of fact."  *Bennett,* 2024 WL 717930, at *1.  Here, Petitioners have failed to raise any dispute of fact which precludes the Court from finding that the requirements of an *inter vivos* gift are met and, thus, Petitioners no longer possess any legal interest in the corresponding funds.  Indeed, Petitioners have not addressed the charitable returns in their briefing at all.  (*See generally* ECF No. 520.)

The Motion is thus granted as to Asset No. 54 in light of Petitioners' failure to point to any evidence supporting that they have a continuing legal interest in the

charitable returns.

**D.    Petitioners Cannot Establish a Superior Interest in the Remaining Claimed Assets**

As to the remaining Claimed Assets, the Government argues that "Petitioners cannot prevail under 21 U.S.C. § 853(n)(6)(A), as a matter of law, because Petitioners' interest in the Claimed Assets did not exist at the time of the commission of the acts that gave rise to forfeiture—the wire fraud conspiracy and scheme." (ECF No. 16.)  The Court, again, agrees.

To reiterate, § 853(n)(6)(A) affords relief to third parties who can establish, by a preponderance of the evidence, that their "right, title, or interest" in property subject to forfeiture "was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property . . . ."  21 U.S.C. § 853(n)(6)(A).  Importantly, § 853(n)(6)(A) "cannot be read in a vacuum but, rather, must be read in tandem with section 853(c)."  *United States v. Catala,* 870 F.3d 6, 10 (1st Cir. 2017); *see also United States v. Watts,* 786 F.3d 152, 166 (2d Cir. 2015) ("Subsection 853(n)(6)(A) works hand in hand with the 'relation-back' doctrine embodied in § 853(c).").

Section 853(c) "provides that all property subject to forfeiture based on a criminal offense ''vests in the United States upon the commission of the act giving rise to [the] forfeiture.'"  *Watts,* 786 F.3d at 166 (quoting 21 U.S.C. § 853(c)).  "It follows inexorably that a third party asserting an interest in forfeited property must establish that his interest in that specific property existed <u>before</u> the commission of the crime that led to the forfeiture" to prevail under § 853(n)(6)(A).  *Catala,* 870 F.3d at 10 (emphasis in original).  For the same reason, "a third party can never have a successful claim under §

11

853(n)(6)(A) if the property was the proceeds of an offense." *United States v. Timley,* 507 F.3d 1125, 1130 (8th Cir. 2007).

Here, the Court has already determined via the POFs that the Claimed Assets are proceeds traceable to Stewart and Sewall's fraud convictions arising from the operation of Mediatrix and Blue Isle. And the summary judgment evidence more specifically establishes that all of the Claimed Assets were purchased by Petitioners using fraudulently obtained investor funds that Stewart remitted to Michael Young as dividends, *after* Stewart and Sewall's wire fraud scheme and conspiracy began in 2015. (ECF No. 585 at ¶¶ 44–47, 50–52.)[3] Significantly, Petitioners do not argue that the Claimed Assets were purchased using any other source of funds, nor do they argue their legal interest in any of the Claimed Assets vested *before* Stewart and Sewall's criminal scheme began. (*See generally* ECF No. 620 at 17–19.) Thus, under the relation-back doctrine—and the overwhelming weight of Circuit authority[4]–the

---

[3] As noted, the limited exceptions are $3,188.79 held in KeyBank account #6425, which the Government has traced to funds received from Petitioners' family and friends and has agreed to exclude from any motion for final orders of forfeiture, (ECF No. 585 at 11 n.9), and the 2019 Honda Odyssey Passenger Van and 2016 Audi A8 Sedan, for which the Youngs were reimbursed by Blue Isle, (*id.* at 9–10 ¶¶ 42–43).

[4] *See, e.g., United States v. Gilowski,* 2024 WL 4262800, at *1 (5th Cir. Sept. 23, 2024) ("The evidence established that Artur's offenses began in September 2014, and continued through September 2019. The Wildwood property was purchased in March 2017, with proceeds from Artur's criminal activity for which he was convicted. The proceeds and any property purchased with the proceeds from Artur's criminal activity vested in the Government at the time Artur committed his offenses."); *United States v. Guerrero,* 37 F.4th 1215, 1219 (7th Cir. 2022) ("because the POF assets had origins in the health care fraud and money laundering conspiracies, title vested with the United States upon their purchase"); *Watts,* 786 F.3d at 166 ("Because forfeitable property vests in the government immediately upon the commission of a criminal act, a third party may prevail under § 853(n)(6)(A) only by establishing that he had a legal interest in the forfeited property *before* the underlying crime was committed—that is, before the government's interest vested.") (citation and quotation marks omitted) (emphasis in original).

12

Government's interest in the proceeds of Stewart and Sewall's offenses likewise vested before any such funds were transferred to Petitioners or used by them to purchase the Claimed Assets. For the same reason, Petitioners claim to relief under § 853(n)(6)(A) necessarily fails.

Nevertheless, Petitioners argue that the law in this Circuit differs. According to them, the Tenth Circuit "squarely rejected" "[t]he Government's argument that under 21 U.S.C. § 853(c) the Government's interest in third party assets relates back to the commission of the Defendant's offense" in a recent decision, *United States v. Peck,* 139 F.4th 1158 (10th Cir. 2025). (ECF No. 620 at 18.) Petitioners instead submit that, "[u]nder *Peck,* the fact that the Petitioners' interest in their own assets vested in themselves, rather than in Defendant Stewart or Defendant Sewall, is dispositive under 21 U.S.C. § 854(n)(6)(A) without regard to 21 U.S.C. § 853(c) and without regard to when the assets were purchased." (*Id.*)

The Court, however, does not interpret *Peck* as broadly as Petitioners. A close examination of the facts and the Tenth Circuit's analysis is instructive.

In *Peck,* the district court entered a preliminary order of forfeiture as to the defendant's interest in a certain parcel of real property after he pled guilty to operating an unlicensed money transmitting business. 139 F.4th at 1162. One of the defendant's employees subsequently filed an ancillary petition seeking to preclude the property from the court's final order of forfeiture based on his claim that "his interest in the Lot was superior to [the defendant's] and the government's." *Id.* at 1162.

The evidence adduced at the subsequent hearing showed that "[n]either [the defendant] nor his funds were involved in this initial purchase or in the hard-money

13

loan." *Id.* at 1163.  Rather, it was only several months later, *after* the employee's legal interest in the property had vested via the initial purchase of the property, that the defendant authorized a wire transfer from an account including tainted funds to pay off the employee's loan.  *Id.*  In that scenario, where the employee's legal interest in the property clearly vested first in time by virtue of his having initially purchased the property using untainted funds, the Tenth Circuit agreed the employee "possessed a superior interest in the Lot as compared to [the defendant] and the government" under § 853(n)(6)(A).  *Id.* at 1172.

Those are most definitely not the factual circumstances here.  As noted, Petitioners here do not argue that their legal interest in the Claimed Assets vested before Stewart and Sewall's criminal conduct began in 2015, nor that any portion of the Claimed Assets were purchased using untainted funds.  Petitioners instead appear to attempt to separate the Claimed Assets from the source of the funds used to purchase them in emphasizing that "neither Defendant Stewart nor Defendant Sewall ever had any interest in Petitioners' assets."  (ECF No. 620 at 19.)  But Petitioners misunderstand the law.  "At the moment of the commission of [Stewart and Sewall's] crimes, all proceeds of [their] crime[s] and any property acquired with those proceeds became the property of the United States"—regardless of whether any property subsequently acquired with those proceeds was purchased by Stewart or Sewall directly, or a third-party recipient of the proceeds, like Petitioners.  *United States v. Eldick,* 2007 WL 624041, at 840–41 (11th Cir. 2007).  Therefore, the Court finds that Petitioners' interest in the Claimed Assets is not superior to that of the Government's.

For these reasons, the Government's Motion is granted to the extent Petitioners

seek relief under § 853(n)(6)(A).

### E.      Petitioners are Not Bona Fide Purchasers

That leaves § 853(n)(6)(B) as Petitioners' only remaining avenue for relief.

"While § 853(n)(6)(A) works hand in hand with the relation-back doctrine, § 853(n)(6)(B) provides a narrow exception to that principle, allowing a limited category of petitioners who 'acquired an interest in the forfeited property *after* the government's interest vested' to prevail at an ancillary hearing."  *Watts,* 786 F.3d at 169 (quoting *Timley,* 507 F.3d at 1130) (emphasis added in original).  Section 853(n)(6)(B) affords relief to third parties who can establish, by a preponderance of the evidence, that they are (1) "a bona fide purchaser for value of the right, title, or interest in the property" and (2) were "at the time of the purchase reasonably without cause to believe that the property was subject to forfeiture under this section."  21 U.S.C. § 853(n)(6)(B).

Though § 853(n)(6)(B) is a better temporal fit for Petitioners' claims, insofar as their legal interest in the Claimed Assets vested *after* the Government's, the Government asserts that Petitioners cannot satisfy § 853(n)(6)(B)'s requirements either.

As a preliminary matter, the Government argues that none of the Petitioners aside from Michael Young are bona fide purchasers for value because they were not "purchasers" of the Claimed Assets at all.  (ECF No. 585 at 19.)  Rather, to the extent they have a legal interest in the Claimed Assets, the Government submits it is because those assets were given to them by Michael Young, or by Mediatrix and Blue Isle at Michael Young's direction.  (*Id.*)

Petitioners counter that "[t]he Government's argument has no merit under the law because *Mr. Young* purchased all of the assets at issue for value and in good faith."  (ECF No. 620 at 20 (emphasis in original).)  In other words, the Court understands

15

Petitioners to argue that Michael Young is the only relevant "purchaser" for purposes of § 853(n)(6)(B).

Petitioners' position is, in the Court's view, legally dubious.  But for simplicity's sake, it will accept Petitioners' contention and assume without deciding, for the purposes of this Order, that it need only consider whether Michael Young satisfies § 853(n)(6)(B).  In so considering, the Court also ultimately elects not to analyze whether Michael Young is a bona fide purchaser for value of the Claimed Assets.  That is because it is well-persuaded that, even if Michael Young can satisfy the first requirement of § 853(n)(6)(B), he was not "reasonably without cause to believe" that the Claimed Assets were subject to forfeiture.  *See United States v. Parenteau,* 647 F. App'x 601, 604 (6th Cir. 2016) ("The 'bona fide purchaser for value' and 'without cause' aspects of § 853(n)(6)(B) are related but distinct requirements, . . . and the petitioner bears the burden of proving both.  Indeed, we have previously denied a petition solely on the basis that the petitioner could not satisfy the without-cause requirement.").

In considering whether Michael Young was reasonably without cause to believe that the Claimed Assets were subject to forfeiture, "[t]he court must examine 'not merely whether the petitioner knowledge of the forfeitability of the asset but whether the petitioner reasonably held the belief that the property was not subject to forfeiture.'" *United States v. Meiri,* 754 F. Supp. 3d 432, 444 (S.D.N.Y. 2024) (quoting *United States v. Dreier,* 952 F. Supp. 2d 582, 588 (S.D.N.Y. 2013)).  "In appropriate circumstances, this objective test requires a petitioner 'to conduct further inquiry before seeking to obtain an interest' in property that may be subject to forfeiture."  *Dreier,* 952 F. Supp. 2d at 588 (quoting *United States v. King,* 2012 WL 2261117, at *9 (S.D.N.Y. June 18,

2012)).  Put differently, "[t]his standard precludes 'willful blindness' on the part of a petitioner and imposes a duty of reasonable inquiry, where warranted, before 'objective reasonableness' can be established."  *United States v. Medina Cuartes,* 155 F. Supp. 2d 1338, 1343 (S.D. Fla. 2001) (internal citation omitted).

Indeed, a petitioner may even be "a victim of fraud and still reasonably have cause to believe that the purchased property was subject to forfeiture—because, say, the petitioner ignored red flags or otherwise acted unreasonably in completing the deal." *Swartz Family Tr.,* 67 F.4th at 518; *see also United States v. Coffman,* 612 F. App'x 278, 287 (6th Cir. 2015) (company was not reasonably without cause to believe property was subject to forfeiture based on "red flags around [the defendant's] financial status" at time of purchase).  Summary judgment is appropriate when, viewed in totality, these red flags demonstrate that petitioners cannot meet their burden to show they were reasonably without cause to believe the assets were fraud proceeds.  *See United States v. Galemmo*, 661 F. App'x 294, 297–298 (6th Cir. 2016); *see also United States v. Evanson,* 2014 WL 971715 (D. Utah Mar. 12, 2014).

As a threshold matter, Petitioners assert it is "important to identify why Mr. Sewall's and Mr. Stewart's assets are subject to forfeiture."  (ECF No. 620 at 30.)  Per Petitioners,

> [t]heir assets are subject to forfeiture because Mr. Sewall and Mr. Stewart were convicted of wire fraud . . . because, among other things, they 'caused false and misleading daily and monthly account statements to be sent to investors that showed that the investors' accounts were earning money through successful trading at that their account balances were growing' and because 'Stewart and Sewall provided, and caused to be provided, to investors and potential investors falsely inflated figures regarding the amount of money that Mediatrix had under its management . . . to make

Mediatrix appear more successful than it was.'

(*Id.* (citing ECF No. 1).)

No question, Stewart and Sewall's false reporting of profits to investors of Mediatrix was a substantial factual underpinning of the Government's case against them at trial.  And "the Government does not dispute that Stewart and Sewall appear to have hid Mediatrix's losses from [Michael] Young."  (ECF No. 633 at 19.)

But it also appears that Petitioners have cherry-picked allegations from the Indictment that best serve their purposes here.  As set forth in the Indictment, as well as the Government's subsequent Sentencing Statements, "Defendants [Stewart and Sewall] executed their *scheme* to defraud through *numerous intentional falsehoods and misrepresentations*," which were not limited to their false reporting of profits to Mediatrix's clients.  (ECF No. 328 at 5; ECF No. 329 at 5 (emphases added); *see also* ECF No. 1.)

Here, the summary judgment evidence establishes that Michael Young, as Mediatrix's primary marketing employee, not only knew some of those misrepresentations were being made to investors to induce their investment, but that he was also complicit in making them.  For instance, Michael Young knew Mediatrix advertised that it had positive gains and trading results since 2013, which was prior to its initial existence in 2015.  (ECF No. 585 at 5 ¶ 19.)  Indeed, Michael Young himself represented to investors that Mediatrix had had years of successful trading, dating back to 2013.  (*Id.*)  He also repeatedly claimed that Mediatrix had not had a single losing month when he knew that Mediatrix had lost all funds it raised from its initial investors in

18

2015.  (*Id.* at 5 ¶¶ 17, 20.)[5]  And he regularly represented that Mediatrix's record of success was audited, when he knew Mediatrix had never had a formal financial audit. (*Id.* at 6 ¶ 25.)  Young also knew that many marketing materials disclosed to investors did not disclose the common ownership between the trader (Mediatrix), who only made money if positive returns were made, and the broker (Blue Isle), who made money regardless of the trading results.  (*Id.* at 5 ¶¶ 13, 29, 30, 36.)

Aside from Mediatrix's advertising materials and marketing efforts, Michael Young was also aware that reports being sent to investors falsely identified the amount of "Assets Under Management" ("AUM") by Mediatrix at any given time.  (*Id.* at 8 ¶ 35.) For example, Michael Young knew that, years prior to Mediatrix, there was a prior Commodity Futures Trading Commission ("CFTC") complaint against Stewart, which was not routinely disclosed to investors prior to 2018.  (*Id.* at 6 ¶¶ 22–24.)  What's more, in March 2015, ADS Securities informed Stewart that it would not do business with Stewart or Mediatrix based on the CFTC complaint.  Stewart forwarded this email and attachments to Young.  (*Id.* at 6 ¶ 22.)  Several individuals also informed Michael Young of their concerns over the validity of Mediatrix's trading results and methods, as did the Financial Conduct Authority in November 2017 and the Securities and Exchange Commission in April 2019.  (*Id.* at 7–8 ¶ 33.)  Young himself even repeatedly questioned the accuracy of numbers he was seeing and sharing with investors on some occasions.

---

[5] Young claims, without supporting evidence, that he "orally disclosed the losses incurred in 2015 to many investors," and "[m]any if not all investors in Mediatrix 1 became investors in Mediatrix 2 and those investors knew about the losses in Mediatrix 1."  (ECF No. 620 at 5 ¶ 20.)  But it is immaterial that that this misrepresentation was not made to *every* investor, and that some investors were obviously aware of the losses because they lost money in 2015.  (*See also* ECF No. 633 at 2 ¶ 20.)

19

(*Id.* at 6–7 ¶ 28.)

Petitioners quibble with the relative of importance of each of these "red flags." (*See, e.g.,* ECF No. 620 at 31 ("The fact that one company did not want to do business with Mediatrix because of Mr. Stewart's CFTC lawsuit did not give Mr. Young reason to know that Mr. Stewart and Mr. Sewall were engaged in a large scale fraud scheme.").) But even assuming Petitioners' subjective assessment had merit, the pertinent inquiry is not whether each was independently sufficient to give Michael Young reason to believe the Claimed Assets were subject to forfeiture. When viewed *in totality*, they are more than sufficient to convince the Court that Petitioners cannot establish Michael Young was reasonably without to cause to believe that the Claimed Assets were fraud proceeds and, thus, subject to forfeiture. *Meiri,* 754 F. Supp. 3d at 449; *see also id.* at 445 (noting that "[s]ome of the issues were more glaring than others, but together they should have been more than enough to raise serious questions about whether the Meiris had acquired the properties through legitimate means"). What's more, the foregoing is not even an exhaustive recitation of the evidence marshaled by the Government in support of its Motion.

Nevertheless, Petitioners also counter that "Mr. Young was reasonably without cause to believe that the assets were subject to forfeiture because Mr. Stewart and Mr. Sewall convincingly lied to him as well to the investors," and he "trusted his partners." (ECF No. 620 at 31–33.) Similarly, Petitioners submit that Michael Young "[o]bjectively . . . had no reason to suspect that his partners were involved in a massive fraud" when (1) Mediatrix's Chief Compliance Officer, Brian Patrick King, allegedly assured him "that reports of client account activity were accurate" and "regulatory protocols were met,"

20

(ECF No. 620 at 11 ¶ 7 (citing ECF No. 585-2 at 344)); (2) "Grant Thornton issued a report that," in Young's view, "supported the strength and integrity of the Mediatrix operation," (ECF No. 620 at 11 ¶ 8 (citing ECF No. 620-6)); and (3) "KPMG also verified the returns as well as the Blue Isle statements," (ECF No. 620 at 12 ¶ 9 (citing ECF No. 620-5)).

Michael Young's alleged subjective reliance on Stewart and Sewall, King, Grant Thornton, and KPMG fails to persuade the Court he was reasonably without cause to believe the Claimed Assets were subject to forfeiture, because the summary judgment evidence supports he had reason to doubt any representations made by those individuals and entities regarding the legitimacy of Mediatrix and Blue Isle's operations. King testified he was hired in February 2018 to obtain licenses, which were never obtained, and he had no compliance functions to fulfill prior to licensing. (ECF No. 633 at 5 ¶ 7.) He further testified he did not have access to the trading data and only reviewed a handful of accounts. (*Id.*) Young also knew that Grant Thornton refused to "provide an assurance of accuracy" because Stewart resisted providing them with information they requested to verify results. (*Id.* at 5 ¶ 8.) Similarly, Young knew KPMG disclaimed that its report would "detect fraud, shortages, errors, or other irregularities should any exist." (*Id.* at 5 ¶ 9.) Indeed, Young himself called the KPMG report "DISASTROUS" because "[t]he numbers are SO far off, almost 9 times off." (ECF No. 585-2 at 266.) The Court is thus hard-pressed to conclude that Michael Young, a CEO and equal one-third partner, was reasonably without cause to know of Stewart and Sewall's misrepresentations to investors based on these sources. *Cf. Medina Cuartes,* 155 F. Supp. 3d at 1343–44 ("Petitioner, an educated businessman and former

21

stockbroker in Colombia, had to know of the unusual nature of such transactions . . . .").

As a final point, Petitioners repeatedly point to the fact that, unlike Stewart and Sewall, Michael Young was never charged with wire fraud.  But the Court is not being asked to determine herein whether Michael Young is as culpable as his business partners.  Rather, the question before the Court is whether Michael Young was "reasonably without cause to believe that the property was subject to forfeiture . . . ." 21 U.S.C. § 853(n)(6)(B).  Based on the totality of the evidence in the record, he assuredly was not.

For these reasons, the Government's Motion is granted to the extent Petitioners seek relief under § 853(n)(6)(B).

## F.    Additional Issues

In their response, Petitioners assert the Claimed Assets should be excluded from the Court's final orders of forfeiture on two additional grounds not raised in the Government's Motion.  First, they argue that the Government's seizure of Michael Young's assets constitutes a breach of his plea agreement and violates the procedures set forth in Fed. R. Crim. P. 32.2.  (ECF No. 620 at 33–37.)  Second, they argue that the Court lacks jurisdiction to enter a final order of forfeiture over the Claimed Assets in light of a parallel United States Securities and Exchange Commission ("SEC") enforcement action.  (ECF No. 620 at 38.)

The Government asserts, as a preliminary matter, that these arguments are not properly asserted for two reasons.  First, it argues that Petitioners lack standing to challenge the Court's finding of forfeitability in the POFs.  *See Andrews,* 530 F.3d at 1236.  And second, the Government points out that a response is an improper mechanism to seek affirmative relief.  *See* D.C.COLO.LCivR 7.1(d).

22

Both of the Government's counterpoints are well taken.  Nonetheless, in the interest of resolving all issues pertaining to the Petition in this Order, the Court will briefly address Petitioners' additional arguments.

1.    Michael Young's Plea Agreement

As noted, Petitioners first contend that, by seeking forfeiture of Michael Young's assets, the Government is violating its plea agreement with him as well as his procedural rights under Fed. R. Crim. P. 32.2.  The Court is unpersuaded by either argument.

With regard to the plea agreement, Petitioners specifically argue that, by "seeking forfeiture of Mr. Young's assets as part of the sentencing of Mr. Stewart and Mr. Sewall, the United States is violating its plea agreement with Mr. Young because Mr. Young entered the plea with the promise by the Government that the Government did not seek forfeiture of his assets."  (ECF No. 620 at 34.)  But the Court discerns no evidence of any such promise from the Government on the record before it.

Petitioners appear to primarily rely on the plain language of the plea agreement. They argue it "shows that the government *did* promise Mr. Young that it would not seek to forfeit his assets" to the extent that it states:

> This document states the parties' entire agreement.  There are no other promises, agreements (or "side agreements"), terms, conditions, understandings, or assurances, express or implied.  In entering this agreement, neither the government nor the defendant has relied, or is relying, on any terms, promises, conditions, or assurances not expressly stated in this agreement.

(ECF No. 620-1 at 12.)

But the integration clause Petitioners cite supports precisely the opposite conclusion.  That is, by its plain language, the integration clause memorializes that the

23

Government made *no* promise or assurance to Michael Young outside of those contained in the plea agreement. *See United States v. Wheeler,* 13 F. App'x 852, 854 (10th Cir. 2001) ("an integration clause normally prevents a criminal defendant, who has entered into a plea agreement, from asserting that the government made oral promises to him not contained in the plea agreement itself"). In this instance, those express promises were limited to the Government's agreement "(a) [to] recommend a sentence within the guideline range of 10 to 16 months; and (b) . . . not to bring any additional criminal charges against the defendant based on the conduct currently known to the government." (ECF No. 620-1 at ¶ 7.) Neither comes close to constituting a promise by the Government that it would not seek forfeiture of any assets in which Michael Young holds a legal interest in Stewart and Sewall's criminal forfeiture proceedings.

The authorities cited by Petitioners are inapposite for substantially the same reason. Both concerned plea agreements containing express, written promises that the court interpreted to limit the Government's ability to forfeit the defendant's assets. *See In re Arnett,* 804 F.2d 1200, 1201, 1203 (11th Cir. 1986) (provision stating "defendant Arnett agrees to the forfeiture of the United States of the Three Thousand dollars on his person at the time of this arrest" could reasonably have been interpreted to exclude forfeiture of Arnett's house and farm); *United States v. D.K.G. Appaloosas, Inc.,* 630 F. Supp. 1540, 1546–51 (E.D. Tex. 1986) (promise in "a pre-plea agreement" "not to impose any further civil sanctions on Bruce Emery Griffin for conduct known to the United States Attorney and committed in the Southern District of Florida prior to the date of the agreement" protected from forfeiture any property owned by Griffin and "known to the United States Attorney at the time of the plea bargain").

24

Moreover, in *Arnett,* the Eleventh Circuit was especially persuaded that the forfeiture provision could reasonably have been interpreted by Arnett and his counsel to limit any forfeiture to $3,000—notwithstanding the plea agreement's integration clause—due to "uncontroverted testimony" that the prosecutor stated during plea negotiations "that her office had no interest in the farm."  *In re Arnett,* 804 F.2d at 1203. While Petitioners baldly aver here that "Mr. Young specifically understood when he entered his plea agreement that the government agreed not to seek forfeiture of his assets," they do not point to any particular oral representations or promises made by the Government that allegedly contributed to that understanding.  (ECF No. 620 at 35.)

Petitioners' arguments regarding the procedural requirements of Fed. R. Crim. P. 32.2 are similarly misplaced.  They argue, for instance, that the Government has violated Fed. R. Crim. P. 32.2(a) because "Mr. Young's Information did not contain any notice that the government would seek forfeiture of Mr. Young's assets."  (ECF No. 620 at 34.)  But forfeiture was not a part of Michael Young's criminal case.  Indeed, it is not even an available remedy for a violation of 18 U.S.C. § 1001.  Thus, as the Government submits, "the attendant criminal forfeiture procedures for entry of the Preliminary Order of Forfeiture . . . were not applicable."  (ECF No. 633 at 24.)

Petitioners likewise argue that the Government has violated Fed. R. Crim. P. 32.2(a) because "the Indictment against Mr. Stewart and Mr. Sewall did not include any notice that *Mr. Young's* assets were at risk in his former partners' proceedings."  (ECF No. 620 at 34 (emphasis in original).)  But in these criminal forfeiture proceedings, Michael Young is a third-party petitioner—not a defendant.  Accordingly, his sole avenue for relief is through an ancillary proceeding under § 853(n); "whether there were

defects in the . . . forfeiture process . . . [is] no concern of his." *Andrews,* 530 F.3d at 1237.

In sum, Petitioners' arguments concerning the terms of Michael Young's plea agreement and purported violations of Fed. R. Crim. P. 32.2 fail to convince the Court that summary judgment should not enter in this ancillary proceeding.

2.      Pending Asset Freeze in the SEC Action

Petitioners' last argument pertains to the SEC's pending civil action against Stewart, Sewall, and Michael Young, among other defendants, for various violations of the securities laws. *See United State Secs. & Exch. Comm. v. Mediatrix Capital Inc. et al.,* Civil Case No. 19-cv-2594-RM-STV ("SEC Action").

Early in that case, Judge Raymond P. Moore entered an order appointing a receiver over the recoverable assets. (ECF No. 620-19.) Petitioners specifically direct the Court's attention to that portion of Judge Moore's order restraining and enjoining "[t]he Receivership Defendants and Receivership Relief Defendants and all persons receiving notice of this Order" from "directly or indirectly taking any action or causing any action to be taken, without the express written agreement of the Receiver, which would . . . [i]nterfere with the Receiver's efforts to take control, possession, or management of any Receivership Property . . . or interfere in any manner with the exclusive jurisdiction of this Court over the Receivership Property or the Receivership Estate." (*Id.* at ¶ 21.)

Petitioners argue that, as a consequence of this asset freeze and injunction, the Court "lacks jurisdiction to adjudicate their Petition based on the SEC receivership," as "[t]he law prohibits two courts from exercising jurisdiction over assets at the same time and this Court cannot enter orders regarding assets that are in the exclusive control of

another Court." (ECF No. 633 at 25.) They cite caselaw generally supporting the proposition that "[t]wo courts may not exercise simultaneous in rem jurisdiction over the same res." *United States v. $2,542 In U.S. Currency*, 754 F. Supp. 378, 379 (D. Vt. 1990); *see also United States v. One 1985 Cadillac Seville, and Approximately $403,097.00 in United States Currency,* 866 F.2d 1142, 1145 (9th Cir. 1989) ("A common-law rule of long standing prohibits a court, whether state or federal, from assuming in rem jurisdiction over a res that is already under the in rem jurisdiction of another court.").

But those circumstances are not attendant here. For one, "[t]he Court does not assume *in rem* jurisdiction over any property in a criminal forfeiture case." *United States v. Caruthers,* 967 F. Supp. 2d 1286, 1288 (E.D. Mo. 2013) (citing *United States v. Totaro,* 345 F.3d 989, 997 (8th Cir. 2003)). Rather, "this criminal forfeiture proceeding is not *in rem,* but *in personam,* and is a proceeding against the defendant[s] [themselves]." *Caruthers,* 967 F. Supp. 2d at 1288. Similarly, "[t]hird parties," like Petitioners, "are given a limited statutory right to petition for an ancillary proceeding, which likewise proceeds *in personam,* where they may assert their own claims to the property to be forfeited." *Id.*

In keeping with this distinction, at least one district court in this Circuit has reasoned that "nothing prohibits the Government from restraining identical property through parallel civil and criminal proceedings." *United States v. Young,* 2013 WL 1341396, at *3 (D. Utah Apr. 3, 2013). Indeed, "Congress long has authorized the Government to bring parallel criminal proceedings and civil forfeiture proceedings . . . ." *United States v. Ursery,* 528 U.S. 267, 287–88 (1996); *see also United States v. One*

27

*Parcel of Real Prop. Described as Lot 41, Berryhill Farm Estates,* 128 F.3d 1386 (10th Cir. 1997) (summarizing procedural history of concurrent criminal and civil forfeiture proceedings before affirming district court's civil forfeiture order).

Finally, at least as a practical matter, the Government represents that it has no intent to interfere with the SEC receiver's custody and control of the assets or Judge Moore's *in rem* jurisdiction over the Claimed Assets. Rather, at this time, it "is merely seeking the adjudication of the validity of Petitioners' Petition under 21 U.S.C. § 853(n) and Fed. R. Crim. P. 32.2(c)(1)." (ECF No. 633 at 25.) "Once the Court determines the validity of any such petition, the Government will then seek to obtain custody and control over any assets for which it intends to seek a final order of forfeiture." (ECF No. 508 at 12–13.)

Consistent with the foregoing, this Court does not purport to rule that the Government may proceed to take physical custody of the Claimed Assets in contravention with any pending orders in the SEC Action. Rather, it finds only that Petitioners are not entitled to the exclusion of the Claimed Assets in any forthcoming final orders of forfeiture on the grounds set forth in § 853(n)—a matter over which it assuredly has jurisdiction. It is otherwise up to the Government to seek appropriate relief in the SEC Action, and Judge Moore's prerogative whether to grant it.

******************

For all the reasons set forth above, the Government's Motion for Summary Judgment is granted in its entirety, and the Petition is accordingly denied.

## II. PETITIONERS' RULE 11 MOTION

Before the parties completed briefing on the Government's Motion for Summary

28

Judgment, Petitioners Michael Young and Maria Young also filed a Motion for Rule 11 Sanctions.  (ECF No. 624.)  Therein, Petitioners ask the Court to award them their "reasonable legal fees and costs incurred . . . in defense of the Government's forfeiture proceedings," (*id.* at ¶ 35), "because [the Government's] argument for forfeiture of the Petitioners' assets ignores binding Tenth Circuit precedent that undermines their claim for forfeiture of the Petitioners' assets"—namely, *Peck,* (*id.* at 1).  For the reasons explained below, the Court declines to impose Rule 11 sanctions against the Government's counsel on that basis.

As pertinent here, Fed. R. Civ. P. 11(b) states that,

> By presenting to the court a pleading, written motion, or other paper . . . an attorney . . . certifies to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> . . .
>
> (2)  the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
>
> . . . .

Fed. R. Civ. P. 11(b)(2).  In this way, "Rule 11 imposes . . . an affirmative duty to conduct a reasonable inquiry into the facts and the law before filing."  *Collins v. Daniels,* 916 F.3d 1302, 1320 (10th Cir. 2019) (internal citation and quotation marks omitted). The Tenth Circuit "evaluate[s] [an attorney's] conduct under a standard of 'objective reasonableness—whether a reasonable attorney admitted to practice before the district court would file such a document.'" *Predator Int'l, Inc. v. Gamo Outdoor USA, Inc.,* 793 F.3d 1177, 1182 (10th Cir. 2015) (quoting *Adamson,* 855 F.2d at 673).

"If, after notice and a reasonable opportunity to respond, the court determines

that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney . . . that violated the rule or is responsible for the violation." Fed. R. Civ. P. 11(c)(1). Any sanction ultimately imposed "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." Fed. R. Civ. P. 11(c)(4); *see also Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 393 (1990) ("[T]he central purpose of Rule 11" is "to deter baseless filings in district court . . . [and] any interpretation must give effect to the Rule's central goal of deterrence.").

Thus, taken together, "the award of Rule 11 sanctions involves two steps. The district court first must find that a pleading violates Rule 11." *Adamson v. Bowen,* 855 F.2d 668, 672 (10th Cir. 1988). "The second step is for the district court to impose an appropriate sanction." *Id.*

Petitioners' Motion fails at the first step. They argue that the Government's counsel violated Rule 11 by failing to cite recent binding Tenth Circuit authority "explicitly reject[ing] the Government's position on the applicability of 11 U.S.C. § 853(n)(6)(A) and 11 U.S.C. § 853(c) . . . ." (ECF No. 624 at ¶ 18.) But as set forth above, the Court disagrees with *Petitioners'* interpretation of *Peck* and has concluded that it affords them no relief under § 853(n)(6)(A). *See* Section I.D. *supra.* Petitioners have thus put the proverbial cart before the horse by seeking Rule 11 sanctions based on their interpretation of an authority yet to be analyzed or applied by the Court in this case or, for that matter, by any other district court in this Circuit to comparable facts. *See Henry v. Black,* 2011 WL 2938450, at *1 (D. Utah July 19, 2011) ("Rule 11 should not be used to raise issues as to the legal sufficiency of a claim or defense that more appropriately can be disposed of by a motion to dismiss, a motion for judgment on the

30

pleadings, a motion for summary judgment, or a trial on the merits.") (internal citation omitted).

What's more, even had the Court ultimately agreed with Petitioners' assessment of *Peck,* the Government's position that the case is factually distinguishable in material aspects would have still been an objectively reasonable one.  *See Bridgestone/Firestone, Inc. v Loc. Union 998, United Rubber, Cork, Linoleum & Plastic Workers of Am., AFL-CIO,* 1990 WL 269443, at *1 (W.D. Okla. Sept. 13, 1990) (concluding Rule 11 sanctions were inappropriate where defendants "made a judgment call that" certain authority was "inapplicable to the facts of the case").

Simply put, the facts of this ancillary proceeding fall far short of the mark of what constitutes the appropriate circumstances for the imposition of Rule 11 sanctions.  For this reason, Petitioners' Motion is accordingly denied.

### III. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.     The Government's Motion for Summary Judgment (ECF No. 585) is GRANTED;

2.     The Second Amended Ancillary Petition (ECF No. 502) is DENIED;

3.     Petitioners' Motion for Rule 11 Sanctions (ECF No. 624) is DENIED;

4.     In consideration of the interplay of the pending SEC Action and the fact that Defendant Michael Stewart has not yet been sentenced, the Government is DIRECTED to file a Notice of its position as to the appropriate time and manner for entry of final orders of forfeiture by no later than **May 7, 2026.**

Dated this 30th day of April, 2026.

BY THE COURT:

_____
William J. Martinez
Senior United States District Judge